All rise. The United States Court of Appeals for the Federal Circuit is now open for discussion. Scott Chase, the United States Senate Honorable Court. Please be seated, ladies and gentlemen. Good morning. We have three cases this morning, two patent cases from district courts and a veteran's case. What we are going to do is hear the first case and then adjourn for five or ten minutes and then return with a slightly modified panel. The first case is K-Tech v. Blonder Tongue et al., 2013-1645. Mr. Bryce. Thank you, Your Honor. Good morning, may it please this panel. Thank you for the opportunity to speak this morning. I wanted to talk first, if I may, about the court's order. There were motions for summary judgment on the other side for invalidity, motions by us to dismiss the invalidity of affirmative defenses. The judge denied our motions and granted the motion for invalidity on the obviousness, but denied the motion on anticipation, and my opponents have not appealed that. In the order, which is in volume one of the appendix, it begins at appendix page A029. At page 34, the district court said the court finds that the Zenith and Divicom products are prior art. The products, not the documents, the products, but the products were never before the district court. What was before the district court was documentation, which did not include diagrams of either product. But look, doesn't the Cartwright reference and the A-65 standard pretty much together, even without Zenith and Divicom lead to the invention? No, Your Honor, and the reason I say no is the Cartwright is about a European system, which we don't use in this country, not the ATSC system, which are the subjects of our patents. If you look at our reply brief, you will see that we have a continuation. But modifying it to meet the American standard, isn't that a pretty obvious thing to do? Well, the patent office said it wasn't obvious to do because in a continuation patent that we obtained after the court ruled, I had turned in the court's ruling, the court's decision, and turned in Cartwright and turned in the A-65 standard. And the patent office said it was not obvious, agreeing with our expert, Mr. Gustin, who explains in his declarations why it is not obvious. Well, two things there. One is maybe the patent examiner was wrong. Well, of course that's a possibility. That's why I gave him the judge's order. Secondly, the new claims that you got had an additional limitation. Now, it may be a minor limitation, or it may be significant, but it was something about having a hierarchy of tables and sub-tables that was the distinguishing factor for the patent examiner to grant you that subsequent patent. Yes, his reason for allowability. Right. Does speak to the claims he allowed. None of the claims here have that particular distinction that the examiner relied upon to give you another patent. Well, I invite your attention, Your Honor, to our reply brief where we show you that one of the claims allowed in the continuation patent is extremely and closely parallel to a claim at issue in the asserted patents that are on appeal here. Well, let's put that to the side. And let's go back to Judge Glory's question, which was… Why is it not obvious? We're talking about two completely different signal systems. The U.S. system has PSIP and data in it. The European system does not. And as we point out in our briefs, DIVICOM reported that while they had a solution for the European system, like Cartwright, they said our solution will not work with the U.S. ATSC system, and we can't make it work with that system. And someone else is going to have to provide that solution. We cannot. Are you saying that a person of the ordinary skill couldn't take a European system that's basically the same as this system and then just plug in through whatever calculations they need to do the American system, that it required something additional than an ordinary person could do? It is unobvious because the systems are different from the get-go. No, no, that's not my question. Clearly, the European standard and the American standard are different. But you have a system in Cartwright using the European standard. Where in the record does it show or not show that an ordinary person couldn't take Cartwright and adapt it using the American standard? It seems fairly straightforward to me. Well, first of all, the Patent Office disagrees with that. Set aside the Patent Office. We have to have somebody tell us if we don't know. Secondly, Mr. Gussin in his declaration explained that the data systems are different and not easily substitutional. They are. Okay, can you explain that point a little bit more because I think that's what you need to show is why aren't they easily substitutable because it doesn't seem to me that it would be that hard for a person of ordinary skill to do it. Well, the systems start with two different kinds of data for the channels. So the solution that works in Cartwright for the European system, if you were to plug it in, as you might say, to the U.S. system, it won't work. It's like trying to put 15-inch tires on a car that will only take 18-inch tires. It simply won't work because the wheel isn't big enough to take the tire. It's the same problem. It isn't mere substitution. It isn't changing a blue coat for a brown coat. The data systems are different. That's not really what the standard is, though. The standard is what a person of ordinary skill could do, and I assume in this area a person of ordinary skill is fairly well educated with these kinds of subjects. They may be two different standards, and it may require some programming or the like, but that's what a person of ordinary skill could do, couldn't he? Well, my own answer is no, because if someone of ordinary skill could do it, they would have done it. They were motivated to do it. There was reason to do it. There's money to be made in this business, but nobody did it because it wasn't as easy as your honors hypothesizes. It simply wasn't. There were only a couple years between the announcement of the 865 standard and the fine date, right? No, wrong. If you look at the Fram Declaration filed by my opponents, he said we were working on it in the mid-1990s. What was your filing date? Our filing date, 2000. Right, and the standard came out in December of 1997. Right, but the point is— We're talking about a couple years. That's true, but we're talking about people who are in the business making an intense effort from the mid-1990s. Mr. Fram says so in his declaration, if you look at it. He says we had a team working on this from the mid-1990s, yet they didn't come up with anything. And when I say they didn't come up with anything, we don't have the design of their product. We don't have the product, and we don't have the specifications for the product. So we are left with his bare-bones statement that it could do thus and such in his declaration. If you look at the Fram Declaration, there's no spec attached to it. The Div Account, no spec attached. We don't know what these products were, but we do know these companies were motivated to try to come up with a solution and did not. Let's go back to Judge Hughes' question. What is the advance here? What was the particular contribution? Was it something related to the difficulty of being able to reduce your client's invention to practice in order to figure out a way on maybe there's something difficult about updating these data tables for these digital broadcast signals? Well, Your Honor, once you know the answer, it doesn't seem so difficult. But at the time, what happened was there was a transition from television programming being in analog form. And you may remember that in the early 2000s, the federal government announced that all television would have to be digital going forward. And if you remember correctly, as I do, many of the broadcasters, including CBS, NBC, and the like, said, We can't do it. We can't make our signals digital and meet your deadline. So they got a several-year postponement of that deadline. So when you say it's all straightforward and easy, if that's so, then why did ABC, CBS, and NBC need several years more continuance to be able to comply? Because it's not as easy as it looks in retrospect. That's why. And because the European system doesn't use the PSIP table, and their experts say so. So when you say now in retrospect it seems simple to me, everything seems simple in retrospect. Xerox seems simple in retrospect after people appreciated its virtue, but not before. So when you say it's merely – and it isn't substitutional because there's nothing to substitute. We don't use the European system. Their system has a different database. So it's not a plug-in to their system to come up with our system. I agree that there's different data, but the concept of updating data tables as they arrive with locally generated data to substitute, that was the contribution Cartwright gave us, right? Only for the European system, not for the U.S. system. Divicon the same. At the same time, Divicon said our system won't work in the United States. How much clearer can that be? We can't provide a solution, they said. Someone else must do so. Everybody in America has to use the 865 standard, right? I don't mean by everybody uses. I mean people who tune into television. Transient digital television signals, you have to use the standard. If you're a broadcaster, that's right. And the standard talks about having system information and then program-specific information, right? Yes. And then there's these virtual channel data tables that are part of the standard. Yes. And everyone has to use it, right? That's right. To comply with the standard, you must. That's correct. But while we all know the goal, how to get to that goal wasn't obvious, any more than when H.G. Wells wrote about machines that would take men to the moon and bring them back alive in the 19th century, did not foreclose the patentability of space vehicles in the 20th century. Because knowing the goal isn't the solution. That's the point. Divicon and Zenith didn't have the solution. Look at the Fram Declaration. You will see that he doesn't attach the diagram, any diagram, showing what the one product he says was sold in 2000 was like. So the court didn't have the product and didn't have the specification, and that's why this is a barbed wire case insofar as that piece of priority is concerned. Mr. Bright, would you like to reserve the remainder of your time for rebuttal or continue? I think I would like just one more minute, if I may. Our opponents have made the point that there is also evidence of long-felt need, and the district court recognized that, even though the district court didn't mention Guston's declarations and didn't rule on our evidentiary objections. He didn't do either one of those. His order doesn't even mention my declarations. It says we filed no evidence in opposition, which is just wrong. But at the end of his opinion, at AO 38, he says that Divicon and Zenith understood that the ATSC standard would have to be incorporated into their commercial products. They both recognized the need, says the court, in the district court. Both recognized the need. But I submit to you that there is no proof that either Divicon or Zenith, two of the bigger companies in this country who were motivated to find the answer, found the answer. So, yes, in retrospect, we all look smart. We understand the answer. But these people didn't know the answer at the relevant, before my client got his patent. I'll reserve. Thanks. Thank you, Mr. Bright. Mr. McNett. Thank you. What can be more obvious than applying a newly adopted standard developed by others to prior art developed by others? That's what we have here. It's the standard that was adopted by other people applied to prior art developed by other people. In KTEC's case, as you pointed out, Judge Chin, all they did is change a data table from one format to another. We asked in deposition, the one deposition taken in this case, a Rule 30b-6 deposition, of the inventor representing KTEC, was there any difference between his claims and the prior art other than the format of the tables? He said he didn't know of any. That's what we're talking about. This suggestion that somehow we have to take the physical products that were made in the prior art and deposit them in the court as though that's going to help the court, looking at them, decide the case, makes no sense. I will also add, this is not a record in the case, but it happened in this case, in our answers to interrogatories, we tendered operating equipment, both from KTEC and from Zenith, for inspection by their expert, and they never took advantage of that. That's their choice. The fact that their deposition doesn't talk about the operating equipment is their fault because they didn't look at the equipment that we had. What about their arguments on secondary considerations? I'll be happy to go through secondary considerations. It doesn't look like the district court did. They didn't present any arguments in their favor. The district court did address secondary considerations to the extent simultaneous invention by others is an indication of a secondary consideration of obviousness because we have not only simultaneous invention, actually prior invention, by Divacom and Zenith, but we tendered evidence of prior invention by others in the industry as well. The court just, for efficiency's sake, took just two of them for exemplars in its opinion. But there were other companies as well, all doing this same thing, before KTEC filed their patent application. So I thought your argument was wavering, that they never properly presented to the district court. They did. That's another problem as well. But the district court, on its own initiative, did find a factor that would be considered a secondary consideration. In any event, if you consider long felt need, it can't be long felt need if a standard is adopted in December of 97. Three months later, Divacom was busily working on a project to build that, and they built a product and offered it for sale before their filing date, before their proven date of invention. That seems pretty clear to me, that there was not a long felt need if in a matter of months the project was started. Pat's entire case is focused on one sentence at the very beginning. Pat? Pat Bright. Okay. It's focused on one sentence at the very beginning of the project where they said, there's no equipment available now on the market. We will have to go somewhere else. They didn't. They specified the product and built it. Of course there wasn't a product in the marketplace. The standard had only been adopted three months earlier. That's what he's hanging his hat on by saying Divacom couldn't do it. They actually did do it. And the affidavit evidence in the case is unrebutted that they did it. Their expert, Gusson, never went out and said, I got one of the Divacom products. I looked at the one they had tendered to inspect. It doesn't work the way they said it does. There's none of that. There's no challenge to the factual underpinnings of the court's decision. So we think it's quite clear that the invention is obvious. Commercial success. No presentation of commercial success arguments. The court below. That's a secondary consideration. Isn't it pretty harsh to invalidate three patents with obviousness? The inference being that there are no genuine issues of material fact or validity, obviousness? Well, KSR didn't seem to have any trouble with it. One patent, one simple invention. The claims are not that much different among the patents. They're all the same family, same specification. It's just a matter of the patent office wanting to get more money for issuing more patents. Used to be, 40 years ago, I had a patent with 118 claims in it once. Couldn't get that today. That's quite an accusation. Just because the PTO wants more money, they're granting more patents? Did I hear you say that? Let's put it a different way. I apologize. Let's say that in order to more narrowly focus their examinations, they require cases to be divided more frequently than they used to. I think that's a fact. Does that sound more diplomatic? Anything further to your argument? Well, I think if we want to address the question of that more recent patent, we haven't had an opportunity to address that. It was first filed in the reply brief. I would like to first state that the record in the patent office for that most recent issued patent did not have any of the evidence dated prior to the filing date that the district court had with regard to Divicon. It did not have any of the evidence that the district court had with regard to Zenith. It did not have the declarations of our expert who was in charge of the Divicon work. The patent office did not have the declaration of the person who was in charge of the Zenith project. Did the patent office have the district court's opinion here? It had the district court's opinion. Which discusses all of this. It discusses the conclusions, but it doesn't give evidence of the dates when these things were done other than by its conclusions. So the record was different in the patent office. The examiner wasn't given the opportunity to review this evidence. And the fourth patent isn't before us. It's not before us. It's actually the fifth patent, right? There's four patents that are... Only three asserted. Only three asserted, okay. Okay, I have no further comments unless you have questions. Apparently not. Mr. McNett, Mr. Bright has two and a half minutes of rebuttal. Thank you, Your Honor. Judge Hughes raised the question of why it wouldn't be perfectly obvious to plug in the European solution. I invite your attention to AO 1176 through AO 1179, which is Mr. Gusson's declaration that the district court didn't say a word about it one way or the other. But it presents a very forceful explanation as to why someone skilled in the art wouldn't look to Cartwright. Among other things, he says, there is no motivation for one to look to the European system when developing a product for use in the U.S. because they use different data structures. Mr. Gusson is a 30-year electrical engineer who was heavily involved in the Challenger communication system. So, as I said before, in retrospect, it may seem simple. At the time, not so much. Now, I also submit to you on the secondaries, Judge Chen raised this, that the DIVICOM devices, we don't have a solution for the United States, even though we have a solution for Europe. Someone else will have to do that. That's failure of others. The district court recognized the need. DIVICOM admitted their own failure. We succeeded. That's a pretty good case for secondaries, I submit to you. If there's doubt, remember, the district court didn't rule on our evidentiary objections and didn't comment on Gusson's declarations. Took no account of them. As for long-felt need, AO2168, the declaration of Mr. Fram, the Zenith guy, he says, beginning in the mid-1990s, Zenith had assembled an engineering team under my supervision to assess possible implementation of ATSC standards in broadcast products. By February of 99, we began working on it, and it wasn't until 2000 that they came up with some product, a product that no one knows anything about except maybe Mr. Fram because we have no diagram of the product. And the best evidence rule, which we assert in the district court, says that you have to put that in. That's the barbed wire case. The barbed wire case is essentially a best evidence case. It says you can't invalidate someone's patent on the testimony of one person, uncorroborated by the documents. And that's still good law in this court. It's been reaffirmed over and over again. So what are we left with? We're left with a hindsight view that Judge Hughes has raised as a proposition that, in retrospect, part right shows us how to fix the U.S. system when it doesn't, and DIVICOM said that the solutions they came up with for the European system don't work in the United States and cannot be converted into a solution for the U.S. So I suggest to you that you should reverse the finding of invalidity for obviousness and find that the defense hasn't been proved up and should be dismissed. Now, one thing we haven't talked about here today at all is the fact that the district court didn't rule on the infringement issue, which makes it harder. Briefly, Mr. Breyfield. I will. I will be brief on this, Your Honor. The district court didn't do the single claim interpretation issue and didn't rule on which claims were or weren't infringed. It makes it harder to review because you're supposed to evaluate. Each claim is supposed to be evaluated individually for validity. How do you do that if you don't know which claims the district court thinks are infringed and which ones you may think are not infringed? This panel can do that. I cited those cases from this court where this court has done it several times. So I submit to you that if you go with me on reversing the invalidity, you should also take a look at the infringement issue. Otherwise, we'll be back up here with more muddle from the district court on infringement. Thank you. Thank you, Mr. Breyfield. The case will be taken under advisement. The panel will return in a few moments. All rise.